UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

TANESHA H. o/b/o M.D.C.,[1]

                   Plaintiff,

     v.

COMMISSIONER OF SOCIAL SECURITY,

                  Defendant.
_____

<u>DECISION & ORDER</u>

20-CV-1843MWP

## **<u>PRELIMINARY STATEMENT</u>**

Plaintiff Tanesha H. ("plaintiff") brings this action on behalf of her minor grandson M.D.C., pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Children's Supplemental Security Income Benefits ("SSI"). Pursuant to the Standing Order of the United States District Court for the Western District of New York regarding Social Security cases dated June 29, 2018, this case has been reassigned to, and the parties have consented to the disposition of this case by, the undersigned. (Docket # 11).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 7, 9). For the reasons set forth below, I hereby vacate the decision of the Commissioner and remand this claim for further administrative proceedings consistent with this decision.

---

[1] Pursuant to the November 18, 2020 Standing Order of the United States District Court for the Western District of New York regarding identification of non-governmental parties in social security opinions, the plaintiff in this matter will be identified and referenced solely by first name and last initial.

# DISCUSSION

## I.      Standard of Review

This Court's scope of review is limited to whether the Commissioner's determination is supported by substantial evidence in the record and whether the Commissioner applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004) ("[i]n reviewing a final decision of the Commissioner, a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision"), *reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district court reviewing the Commissioner's determination to deny disability benefits is directed to accept the Commissioner's findings of fact unless they are not supported by "substantial evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted).

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight."  *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988).  To the extent

they are supported by substantial evidence, the Commissioner's findings of fact must be

sustained "even where substantial evidence may support the claimant's position and despite the

fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise."  *Matejka v.*

*Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d

60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A child is disabled for the purpose of SSI if he or she has "a medically

determinable physical or mental impairment, which results in marked and severe functional

limitations, and which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

When assessing whether a claimant is disabled, the ALJ must employ a three-step sequential

analysis.  *See* 20 C.F.R. § 416.924; *see also Miller v. Comm'r of Soc. Sec.*, 409 F. App'x 384,

386 (2d Cir. 2010) (summary order).  The three steps are:

(1)     whether the child is engaged in substantial gainful activity;

(2)     if not, whether the child has a medically determinable
        impairment or combination of impairments that is severe
        such that it causes more than minimal functional
        limitations; and

(3)     if so, whether the child's impairments or combination of
        impairments meet, medically equal, or functionally equal a
        presumptively disabling condition listed in Appendix 1 of
        Subpart P of Part 404 of the relevant regulations (the
        "Listings").

*See* 20 C.F.R. §§ 416.924(b)-(d).

In determining whether a child's impairments or combination of impairments

meet, medically equal, or functionally equal one of the Listings, the ALJ must evaluate the

child's functioning across the following six domains of functioning:

(1)     acquiring and using information;

3

  (2)  attending and completing tasks;

  (3)  interacting and relating with others;

  (4)  moving about and manipulating objects;

  (5)  caring for oneself; and

  (6)  health and physical well-being.

*See id.* §§ 416.926a(b)(1)(i)-(vi).  To be functionally equal, the impairment must result in a finding of "marked" limitations in two domains of functioning or a finding of "extreme" limitations in at least one domain of functioning.  *See id.* at § 416.926a(a).

  A "marked" limitation is one that is "'more than moderate' but 'less than extreme'" and that "interferes seriously with [a child's] ability to independently initiate, sustain, or complete activities."  *Id.* at § 416.926a(e)(2)(i); *see also Spruill ex rel. J.T. v. Astrue*, 2013 WL 885739, *5 (W.D.N.Y. 2013) ("[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the child's] ability to function independently, appropriately, effectively, and on a sustained basis") (quoting 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C)). An "extreme" limitation is "more than marked" and one which "interferes very seriously with [a child's] ability to independently initiate, sustain or complete activities."  20 C.F.R. § 416.926a(e)(3)(i).

## II.  <u>The ALJ's Decision</u>

  In his decision, the ALJ followed the required three-step analysis for evaluating childhood disability claims.  (Tr. 15-32).[2]  Under step one of the process, the ALJ found that

---

[2]  References to page numbers in the Administrative Transcript (Docket # 6) utilize the internal Bates-stamped pagination assigned by the parties.

M.D.C. had not engaged in substantial gainful activity since November 15, 2017, the application date.  (Tr. 18).  At step two, the ALJ concluded that M.D.C. had the severe impairments of speech/language delays and attention deficit hyperactivity disorder ("ADHD").  (Tr. 18-20).  At step three, the ALJ determined that M.D.C. did not have an impairment or combination of impairments that met or medically equaled one of the Listings.  (Tr. 20-22).

In addition, the ALJ concluded that M.D.C. did not have an impairment or combination of impairments that functionally equaled one of the Listings.  (Tr. 22-32).  In reaching this conclusion, the ALJ evaluated M.D.C.'s impairments across the six domains of functioning.  (*Id.*).  Specifically, the ALJ concluded that M.D.C. suffered from less than marked limitations in the domains of acquiring and using information, attending and completing tasks, interacting and relating with others, and moving about and manipulating objects.  (Tr. 22-29).  The ALJ also concluded that M.D.C. had no limitations in the domains of caring for himself and health and physical well-being.  (Tr. 29-32).  Accordingly, the ALJ found that M.D.C. is not disabled.  (Tr. 32).

### III.     Plaintiff's Contentions

Plaintiff contends that the ALJ's determination that her grandson is not disabled is not supported by substantial evidence and is the product of legal error.  (Docket # 7-1 at 11-18).  First, plaintiff maintains that the ALJ improperly relied upon a misstatement in the record when he rejected the opinion of the non-examining state consultant, Dr. J. Meyer, M.D., that M.D.C. suffered from a marked limitation in the domain of interacting and relating with others.  (*Id.* at 11-13).  Second, plaintiff contends that the ALJ's determination that M.D.C. has less than marked limitations in the domains of acquiring and using information, attending and completing

tasks, and interacting and relating with others is not supported by substantial evidence.  (*Id.* at 13-18).

IV.   <u>Analysis</u>

       Having carefully reviewed the ALJ's decision and the record as a whole, I agree with plaintiff that the ALJ's determination was fundamentally flawed.  In reaching his conclusions across several of the domains, the ALJ improperly minimized the evidence demonstrating M.D.C.'s significant social and emotional deficits and seemingly relied upon his own lay opinion in determining that those difficulties were not abnormal for children of plaintiff's age.  This error requires remand.

       The record demonstrates that when M.D.C. was approximately two-and-a-half years old, plaintiff requested that M.D.C. be evaluated for Early Intervention services based upon her concerns with his development, particularly his expressive language skills.  (Tr. 158-64).  On June 21, 2017, M.D.C. was evaluated by special education teacher Tara Caldwell, M.S. Ed., and speech and language therapist Kristin Jaskolka, M.S., CCC/SLP/L.  (*Id.*).  Upon evaluation, M.D.C. demonstrated scores within normal limits in the areas of cognition, social and emotional development, adaptive domain development, and physical development.  (*Id.*).  He demonstrated deficits in receptive and expressive language development.  (*Id.*).  His receptive language scores were approximately 1.5 standard deviations below the mean, demonstrating a moderate delay, and his expressive scores were 2.0 standard deviations below the mean, demonstrating a severe delay.  (*Id.*).  He was also judged to have a significant speech production delay, and early intervention services to improve his communication skills were recommended.  (*Id.*).

Later that year, M.D.C. began attending Donovan Academy Head Start. (Tr. 213-20). On December 21, 2017, his teacher, Ms. Bushra Munir, completed a teacher questionnaire. (*Id.*). According to Munir, M.D.C. attended the preschool program five days per week in a 4:1 classroom setting. (*Id.*). Munir reported that M.D.C. did not demonstrate any problems in the domain of moving about and manipulating objects. (*Id.*). In the domain of acquiring and using information, Munir assessed that M.D.C. had very serious problems in his ability to understand and participate in class discussions; provide organized oral explanations and adequate descriptions; express his ideas in written form; and, apply problem solving skills in class discussions. (*Id.*). She also assessed that M.D.C. had obvious problems comprehending oral instructions; learning new material; and, recalling and applying previously learned material. (*Id.*). According to Munir, M.D.C. did not have any problems understanding school and content vocabulary; reading and comprehending written material; and, comprehending and doing math problems.

With respect to the domain of caring for himself, Munir assessed that M.D.C. demonstrated very serious problems in his ability to be patient; respond appropriately to changes in his own mood; and, use appropriate coping skills. (*Id.*). She also assessed that M.D.C. demonstrated serious or obvious problems in his ability to handle frustration; care for his physical needs; use good judgment regarding his personal safety; identify and appropriately assert his emotional needs; and, know when to ask for help. (*Id.*). According to Munir, M.D.C. had slight to no problems in his ability to care for his personal hygiene and cooperate in taking needed medication. (*Id.*).

Munir observed that M.D.C. displayed the most significant problems in the domains of attending and completing tasks, and interacting and relating with others. (*Id.*). With

respect to attending and completing tasks, Munir assessed that M.D.C. demonstrated very serious or serious problems in his ability to focus or refocus on tasks; wait for his turn; transition between activities without being disruptive; organize his belongings; and, work without distracting himself or others. (*Id.*). Munir reported that M.D.C. exhibited these problems on a daily basis. (*Id.*). Munir also observed that M.D.C. had obvious problems sustaining attention during play or sports; carrying out single or multi-step instructions; and, completing assignments. (*Id.*). According to Munir, M.D.C. had slight problems paying attention when spoken to directly and working at a reasonable pace. (*Id.*). Munir explained that M.D.C. required redirection "at all times" in order to remain focused on classroom activities. (*Id.*). She also reported that he had difficulty transitioning between activities, which caused him to cry. (*Id.*).

In the domain of interacting and relating with others, Munir reported that M.D.C. demonstrated very serious or serious problems on a daily basis in his ability to make friends; seek attention appropriately; ask permission; follow classroom rules; respect and obey adults; relate experiences and tell stories; use language appropriate to the situation and listener; introduce and maintain relevant and appropriate topics of conversation; take turns during conversation; and, use adequate vocabulary and grammar to express his thoughts and ideas. (*Id.*). According to Munir, M.D.C. also demonstrated obvious problems in his ability to play cooperatively with other children and appropriately express anger, and a slight problem in his ability to interpret facial expressions and body language. (*Id.*). Munir assessed that she was able to understand very little of M.D.C.'s speech. (*Id.*). According to Munir, although the classroom ratio was 4:1, another teacher had been placed into the classroom for additional support. (*Id.*). Munir reported that M.D.C. required consistent redirection for classroom activities and that he disturbed the other children when he was not interested in participating in activities. (*Id.*).

8

During the spring of 2018, when M.D.C. was approximately 3 years and two months old, he underwent further evaluation at the direction of the Committee on Preschool Special Education ("CPSE") to determine his intervention needs for the upcoming school year. (Tr. 308-28). On March 7, 2018, school psychologist Rachelle Strickland, MA, CAS, conducted a psychological evaluation of M.D.C. (Tr. 321-25). According to Strickland, M.D.C.'s teacher, Ms. Munir, reported that he constantly moved about the classroom, would not sit during circle time, and displayed tantrums, characterized by crying and throwing things, when he did not get his way. (*Id.*). Strickland assessed that M.D.C. had a full-scale IQ of 82, which was within the low average range. (*Id.*).

With respect to M.D.C.'s social emotional development, Munir reported that although M.D.C. was very bright and intelligent, he was easily distracted, had a short attention span, had difficulty concentrating, often seemed out of touch with reality, and sometimes acted as if the other children "were not there." (*Id.*). Strickland reported that M.D.C. demonstrated clinically significant problems on the depression, attention, and atypicality scales, "denot[ing] high levels of maladaptive behaviors which in its severity warrants a need to be monitored carefully." (*Id.*). According to Strickland, M.D.C. scored "at-risk" with respect to his withdrawn and anxious tendencies, as well has his hyperactive behaviors. (*Id.*). She also indicated that M.D.C.'s scores on the adaptive scale suggested that he had some difficulty with adapting to changes in his environment. (*Id.*).

On March 13, 2018, Tamara Roberts, CCC/SLP, a certified speech and language therapist conducted a speech and language evaluation. (Tr. 308-11). She noted that M.D.C. required "maximum re-directional cues" to keep him on task and that M.D.C. was easily distracted, particularly when presented with auditory as opposed to visual cues. (*Id.*). Upon

evaluation, Roberts assessed that M.D.C.'s receptive language skills and speech production were two standard deviations below mean and that his expressive language skills were approximately three standard deviations below mean. (*Id.*). She opined that M.D.C.'s delays in speech and language "greatly affect his ability to have successful interactions across all situational contexts." (*Id.*).

On March 19, 2018, special education teacher Virginia K. Serpico, M.S. Ed., conducted an educational assessment and observation of M.D.C. in his classroom. (Tr. 316-20). She reported that he easily transitioned to his meeting with her, but he did not make eye contact with her and constantly fidgeted with a foam stamp he was holding. (*Id.*). According to Serpico, M.D.C. explored the materials she brought, but he became unhappy whenever she attempted to direct his activity, and he would cry and withhold items when she attempted to take them away. (*Id.*). She assessed that M.D.C. used some reasonable word approximations, but that he would be unlikely to be understood out of context. (*Id.*). When she returned him to his classroom, M.D.C. became agitated, started to cry, and threw himself on the floor outside of his classroom door. (*Id.*). He was eventually coaxed inside the classroom, but promptly threw himself on the floor again and cried. (*Id.*). His teachers were eventually able to calm him by offering him hugs, support, and additional foam stamps to hold. (*Id.*). They reported that M.D.C.'s behavior was typical for any transition in and out of the classroom. (*Id.*).

Serpico assessed that M.D.C. demonstrated age-appropriate gross motor and cognitive skills, although he was distracted and required repeated prompting when the standardized testing was administered, and his cognitive development skills were rated in the seventh percentile, indicating a moderate delay in skill development. (*Id.*). Serpico assessed that M.D.C. demonstrated social skills at the twenty-four month age level, suggesting a severe delay.

(*Id.*).  According to Serpico, M.D.C.'s standardized test scores demonstrated that M.D.C.'s percentile rank was 6 percent, indicating that he exhibited fewer social skills than 94 percent of his comparators.  (*Id.*).  With respect to problem behaviors testing, M.D.C. exhibited a percentile rank of 81 percent, "meaning that he exhibits as many or more problem behaviors than more than 81% of the students in the comparison group."  (*Id.*).

On March 23, 2018, occupational therapist Renee A. McKenzie, OTR/L, conducted an occupational therapy evaluation of M.D.C.  (Tr. 312-15).  McKenzie observed M.D.C. in his classroom and noted that he did not interact with the other children and demonstrated minimal eye contact with his teachers or peers.  (*Id.*).  According to McKenzie, M.D.C. required teacher support and was given a fireman's hat to entice him to transition to the evaluation room.  (*Id.*).  During her evaluation, M.D.C. was frequently distracted, which interfered with his ability to complete tasks.  (*Id.*).  McKenzie administered the evaluation in a non-standardized fashion due to M.D.C.'s difficulty following verbal directions, and he required multiple visual and verbal prompts in order to complete tasks.  (*Id.*).  McKenzie assessed that M.D.C. had a moderate fine motor delay.  (*Id.*).  She also suspected that he had a severe delay in sensory processing based upon her observations and his teacher's report.  (*Id.*).

On April 6, 2018, state agency consultant Dawn Grasso-Megyeri, M.S., CCC-SLP, conducted a speech and language evaluation of M.D.C.  (Tr. 301-304).  At the time, M.D.C. was just over three years old.  (*Id.*).  Upon evaluation, Grasso-Megyeri noted that M.D.C. demonstrated some articulation errors, but opined that they did not significantly impact his ability to be understood.  (*Id.*).  She assessed that he had a mild expressive language delay that was not likely to impact his educational success or ability to communicate with his peers.

(*Id.*).  According to Grasso-Megyeri, at the conclusion of the evaluation M.D.C. "had a huge

temper tantrum," during which he yelled, cried, screamed, and refused to put on his coat.  (*Id.*).

M.D.C.'s IEP for the 2018-2019 school year indicates that he was placed in a

6:1:1 special education classroom and received speech and language therapy three times per

week, occupational therapy two times per week, and physical therapy once per week.

(Tr. 200-12).  The IEP indicated that M.D.C.'s "rote academic skills" were high, but that he

struggled in the classroom.  (*Id.*).  According to his teacher, he required one-on-one attention to

participate in circle time, struggled to follow directions, and needed frequent prompting and

assistance.  (*Id.*).  M.D.C. reportedly struggled with transitions throughout the school day,

particularly from preferred to less preferred activities.  (*Id.*).  M.D.C. often cried and threw

himself on the floor during transitions and typically required a preferred toy to transition him

back into the classroom.  (*Id.*).  M.D.C.'s teacher reported that he struggled to maintain eye

contact and frequently appeared to "be in his own world."  (*Id.*).  M.D.C. engaged in appropriate

independent play in a one-on-one setting but struggled with independent play in the classroom

setting.  (*Id.*).  According to his teacher, M.D.C. struggled with pretend play and would engage

in some play with his peers with prompting, although this occurred minimally.  (*Id.*).

M.D.C.'s progress was evaluated in a November 2018 IEP report.  (Tr. 342-50).

M.D.C.'s speech and language therapist, Amy Petrunyak, M.S. Ed., CCC-SLP, reported that

M.D.C. was able to follow one-step directions but had difficulty transitioning from therapy back

to the classroom.  (*Id.*).  She reported that during transitions, M.D.C. would "scream, yell, and

fall to the floor."  (*Id.*).  According to Petrunyak, she employed timer and visual cues to prepare

M.D.C. for transition back to the classroom, but these cues were not always effective.  (*Id.*).

M.D.C.'s special education teacher, Shannon Welsh, M.S. Ed., also reported that

M.D.C. demonstrated difficulty with transitions irrespective of whether the transition was to a

preferred or less preferred activity.  (*Id.*).  She reported that he required an adult to assist him

with transitions, including physically carrying him to activities outside of the classroom.  (*Id.*).

With respect to his attention, she reported that M.D.C. was able to maintain attention for

approximately three minutes if the activity was a preferred one and that he required an adult

within close proximity to assist his focus if the activity was less preferred.  (*Id.*).  According to

Welsh, M.D.C. preferred to play alone but would sometimes interact with a particular peer

within the classroom for short periods of time.  (*Id.*).  Welsh reported that M.D.C. frequently

grabbed toys from his peers.  (*Id.*).

On January 9, 2019, both Petrunyak and Welsh provided further reports regarding

M.D.C.'s progress.  (Tr. 443-50).  They both indicated that M.D.C. continued to struggle during

transitions irrespective of whether the activities were preferred ones and despite the

implementation of several modalities to prepare him for transition, including visual cues, a timer,

and toys and songs.  (*Id.*).  According to his teachers, M.D.C. continued to engage in unsafe

behavior during transitions including yelling, crying, throwing himself on the ground, throwing

toys or other objects, and pushing his peers.  (*Id.*).

On January 23, 2019, when M.D.C. was four years old, his occupational therapist,

Andrea Merkel, M.S. OTR/L, provided a progress report to the CPSE.  (Tr. 355-57).  At the

time, M.D.C. was attending Empower Children's Academy in a full-day, 8:1:3 special education

classroom setting.  (*Id.*).  She reported that M.D.C. demonstrated difficulty following

adult-directed activities, requiring extra time and encouragement to complete all fine motor

tasks.  (*Id.*).  According to Merkel, she employed extra time and warnings before each transition,

especially before transitioning back into the classroom, but that transitions were "inconsistently tolerated." (*Id.*). She reported that M.D.C. required extra prompts and strategies in order to focus, particularly in busier environments. (*Id.*). She indicated that M.D.C. was "quick to show frustration" but was beginning to respond to "first, then" redirection. (*Id.*). She concluded that he had an approximate 12-16 month delay in motor skills and an approximately 6-12 month delay in activities of daily living skills. (*Id.*). According to Merkel, M.D.C. had difficulty accepting adult-directed tasks and transitions without intervention and filtering out environmental visual and auditory sensory stimuli. (*Id.*).

On January 24, 2019, M.D.C.'s physical therapist, Margret Nawrocki, P.T., BS, completed a progress report for M.D.C.'s upcoming CPSE review. (Tr. 358-59). Nawrocki reported that M.D.C. frequently refused adult-directed requests and that attempts at redirection were inconsistently successful. (*Id.*). According to Nawrocki, M.D.C. continued to experience difficult transitions, characterized by crying, swinging his arms, banging on doors, and dropping to the floor. (*Id.*). She opined that M.D.C.'s gross motor delays did not "appear to be affecting his educational process at this time." (*Id.*).

On February 4, 2019, M.D.C.'s speech and language pathologist, Claire Angle, M.A., CCC-SLP/L, provided a report of M.D.C.'s progress to CSPE. (Tr. 360-61). She reported that M.D.C. could sometimes follow one-step directions but was not capable of following directions with more than one component. (*Id.*). According to Angle, M.D.C. required frequent redirection to maintain focus and required repeated prompting to follow directions. (*Id.*). She assessed that he continued to have more than a thirty-three percent delay in speech-language development, including receptive language, expressive language, speech production, and pragmatic/social language skills. (*Id.*).

14

On February 10, 2019, M.D.C.'s special education teacher, Jennifer Heinze, B.S., Sp. Ed., completed a progress report for CPSE.  (Tr. 352-54).  Heinze reported that M.D.C. needed moderate support to maintain attention during teacher-led activities and an adult in close proximity during teacher-led math activities.  (*Id.*).  According to Heinze, M.D.C. was able to follow two-step directions and was demonstrating appropriate pre-academic concepts and rote skills.  (*Id.*).  Heinze reported that M.D.C. continued to struggle with all transitions, despite multiple intervention strategies including a picture schedule, visual timer, and use of transition toys, songs, and manipulatives.  (*Id.*).  She reported that M.D.C. required moderate adult support throughout the day to keep him on task and in his seat.  (*Id.*).  According to Heinze, M.D.C. would frequently cry or leave the table during activities and had a difficult time sitting still.  (*Id.*).  She observed that M.D.C. continued to demonstrate unwanted behaviors when he was unwilling to participate in an activity, including throwing himself back in his chair, crying, yelling, and throwing objects.  (*Id.*).

Approximately nine months later, Heinze completed a teacher questionnaire relating to M.D.C.  (Tr. 247-54).  At that time, M.D.C. continued to attend full-day special education preschool in an 8:1:3 classroom setting.  (*Id.*).  According to Heinze, in the domain of acquiring and using information, M.D.C. had no problems understanding school and content vocabulary; understanding and participating in class discussions; learning new material, recalling and applying previously learned material; and, applying problem-solving skills in class discussions.  (*Id.*).  He demonstrated slight problems in his ability to comprehend oral instructions; read and comprehend written material; comprehend and do math problems; and, provide organized oral explanations and adequate descriptions.  (*Id.*).  Heinze assessed that M.D.C. had a serious problem in his ability to express his ideas in written form.  (*Id.*).  She

reported that M.D.C. was a "bright boy" who had some articulation deficits that impacted his receptive language skills and his ability to be understood and express his ideas. (*Id.*). According to Heinze, she was able to understand M.D.C. approximately one-half to two-thirds of the time when the topic was known but only half of the time when the topic was unknown. (*Id.*).

In the domain of moving about and manipulating objects, Heinze reported that M.D.C. had slight problems in his ability to move from one place to another; demonstrate strength, coordination, and dexterity in activities or tasks; integrate sensory input with motor output; and, plan, remember, and execute controlled motor movements, and he had obvious problems in his ability to move and manipulate things; manage the pace of physical activities or tasks; and, show a sense of his body's location and movement in space. (*Id.*). She reported that M.D.C. required hand-over-hand support for a variety of fine motor tasks and was unsteady on his feet during gross motor activities. (*Id.*).

In the domain of caring for himself, Heinze assessed that M.D.C. had serious problems (on an hourly basis) in his ability to appropriately handle frustration and appropriately respond to changes in his own mood. (*Id.*). She also assessed that he had obvious problems (on a daily basis) in his ability to be patient; identify and assert his emotional needs; and, use appropriate coping skills to meet the daily demands of his school environment. (*Id.*). According to Heinze, M.D.C. had slight problems in his ability to know when to ask for help; care for his physical needs; and, use good judgment regarding his personal safety and dangerous circumstances. (*Id.*). She reported that M.D.C. struggled with self-regulation and required adult support to calm himself and to ask for help. (*Id.*). According to Heinze, M.D.C. engaged in a variety of behaviors when he was upset or transitioning, including, crying, yelling, kicking or throwing furniture, and throwing himself on the floor.

16

In the domain of attending and completing tasks, Heinze reported that M.D.C. had serious problems (on an hourly basis) in his ability to wait to take turns; change from one activity to another without being disruptive; and, work at a reasonable pace and finish on time.  (*Id.*). She assessed that M.D.C. had obvious problems (on a daily basis) in his ability to carry out multi-step instructions and complete class and homework assignments.  (*Id.*).  According to Heinze, M.D.C. had slight problems (on a daily basis) in his ability to pay attention when spoken to directly, sustain attention during play and sports activities; refocus to tasks when necessary; and, work without distracting himself or others.  (*Id.*).  Heinze indicated that M.D.C. had no problems in his ability to focus long enough to finish assigned activities or tasks; carry out single-step instructions; organize his own things or school materials; and, complete work accurately without careless mistakes.  (*Id.*).  Heinze explained that M.D.C. takes a long time to complete tasks and frequently wants to start over if he makes even a slight mistake.  (*Id.*). According to Heinze, M.D.C. continued to struggle with all of his transitions throughout the day, often getting physically upset.  (*Id.*).  She also reported that he had difficulty waiting for his turn or not being first for everything.  (*Id.*).

"[T]he ALJ may not ignore or mischaracterize evidence of a person's alleged disability, *Mitchell v. Comm'r of Soc. Sec.*, 2019 WL 2399533, *3 (W.D.N.Y. 2019), and "[c]ourts frequently remand an ALJ's decision when it ignores or mischaracterizes medical evidence or cherry-picks evidence that supports his RFC determination while ignoring other evidence to the contrary," *Jackson v. Kijakazi*, 588 F. Supp. 3d 558, 585 (S.D.N.Y. 2022); *see King v. Colvin*, 2016 WL 1398987, *4 (W.D.N.Y. 2016) ("[w]here an ALJ mischaracterizes the evidence or relies on only the portions of the record that support a conclusion of 'not disabled,' a remand is necessary"); *Ellis v. Colvin*, 29 F. Supp. 3d 288, 302 (W.D.N.Y. 2014) ("[i]t was

plainly improper for the ALJ to bolster his own RFC assessment with a blatant misstatement of the record"). Moreover, it is improper for the ALJ to make a determination based upon his own unsupported surmise of the import of the medical evidence. *Primes v. Colvin*, 2016 WL 446521, *4 (W.D.N.Y. 2016) ("[t]his assessment is the result of a hunch and an ALJ may not rely on a hunch") (quotation omitted).

As the above summary of the record demonstrates, almost every one of M.D.C.'s teachers, therapists, and evaluators identified concerns regarding his difficulty managing transitions and maintaining attention for activities and tasks. Although the ALJ acknowledged throughout the decision that M.D.C. appeared to have "concentration and emotional difficulties," he erroneously diminished the frequency with which M.D.C. experienced these difficulties, repeatedly suggesting that they occurred "on occasion" or "at times." (Tr. 20, 21, 23). Review of the record, however, suggests that M.D.C. displayed concentration and emotional difficulties on a daily and even hourly basis. (Tr. 215, 216, 249, 250, 252). Indeed, the record is replete with reports from M.D.C.'s teachers, who observed and interacted with M.D.C. on a daily basis, that he expressed behavioral outbursts during virtually every activity transition and that he required significant redirection to focus on tasks. (Tr. 202, 204, 215, 216, 249, 250, 252, 346, 352, 353, 449, 450). Similar observations were consistently made by M.D.C.'s therapists, who met with M.D.C. at least weekly. (Tr. 203, 343, 347, 355, 356, 357, 358, 361, 444, 445). Further, despite the ALJ's suggestion to the contrary (Tr. 21 ("[M.D.C.] does appear to respond to redirection")), the evidence demonstrates that implementation of a variety of modalities to assist M.D.C. with transitions and focus were inconsistently effective. (Tr. 356, 358, 444, 449).

The ALJ also diminished the significance of M.D.C.'s difficulties based upon his own observation that "such deficits would not necessarily be uncommon in a child of the

claimant's age." (Tr. 23). Of course, the teachers, evaluators, and therapists reported their

concerns regarding M.D.C.'s behaviors with reference to and compared with behaviors expected

from children of M.D.C.'s age.[3]  Indeed, the standardized testing administered by Serpico

suggested that M.D.C. had a severe delay in social skills because his test results demonstrated

that he exhibited fewer social skills than 94% of children his age. (Tr. 316-20). Similarly,

M.D.C.'s problem behavior scores demonstrated that he exhibited as many or more problem

behaviors than more than 81% of students his age. (*Id.*). Additionally, the results of the

psychological evaluation administered by Strickland demonstrated that M.D.C. had clinically

significant problems on the depression, attention, and atypicality scales, which Strickland

indicated "denote[ed] high levels of maladaptive behaviors which in its severity warrants a need

to be monitored carefully." (Tr. 321-25). She also reported that M.D.C. scored "at risk" with

respect to his withdrawn and anxious tendencies, as well as his hyperactive behaviors, and that

M.D.C.'s scores on the adaptive scale suggested that he experienced some difficulty with

adapting to changes in his environment. (*Id.*). In contrast, the ALJ offered no record support or

explanation for his conclusion that M.D.C.'s difficulties may simply have owed to his age.

      Review of the decision demonstrates that the ALJ's mischaracterization of the

frequency of M.D.C. behavioral issues, and his unsupported presumption that M.D.C.'s

difficulties likely were simply characteristic of his age, permeated the entire decision, including

his evaluation of M.D.C.'s impairments across several of the domains of functioning. In the

---

[3] For instance, the teacher questionnaires completed by Munir and Heinze specifically instructed them to "compare [M.D.C.'s] functioning to that of same-aged children who do not have impairments." (Tr. 213, 247). The forms further instructed that if M.D.C. was receiving special education services, his functioning should nevertheless be compared "to that of same-aged, unimpaired children who are in regular education." (Tr. 213, 247). Additionally, for each of the functional domains, the teachers were asked to identify problems only if M.D.C.'s functioning did not appear "age-appropriate." (Tr. 214-18, 248-52). Similarly, several of M.D.C.'s therapists evaluated his functioning in various skills as compared to other children of his age, concluding that he exhibited delays in speech and language, motor skills, and activities of daily living. (Tr. 355-57, 360-61).

ALJ's summary of the evidence at step two, the ALJ repeatedly suggested that M.D.C's

behavioral problems were sporadic and typical of a child of M.D.C.'s age.  (Tr. 19-20 (M.D.C.'s

tantrum during independent consultant evaluation was "not necessarily uncommon given his

age"; M.D.C. experienced "*occasional* tantrums/behavioral outbursts and difficulties with

emotional regulation *at times* (though, again, he was not quite 4 at the time") (emphasis added)).

When evaluating M.D.C.'s mental impairments across the four broad functional areas,[4] the ALJ

continued to minimize M.D.C.'s concentration and behavioral difficulties.  (Tr. 21 ("[t]here are

some indications of behavioral difficulties *at times*, with a tendency to throw tantrums in

response to frustration, but this too is not necessarily an uncommon behavior in children of the

claimant's age"; "he seems to have some difficulties regulating his emotions *at times*, but again it

must be noted that such outbursts at that age are not necessarily uncommon") (emphasis added)).

 The ALJ's minimization of M.D.C.'s difficulties also affected his evaluation of

the persuasiveness of the questionnaires submitted by M.D.C.'s teachers.  (Tr. 23 "the claimant

does appear to have had concentration and emotional difficulties *at times*; . . . it is again noted

that such deficits would not necessarily be uncommon in a child of the claimant's age"; "the

serious and very serious limitations proposed in these teacher reports . . . may at least in part be

determined by the claimant's young age") (emphasis added).  It also affected his consideration of

M.D.C.'s limitations across several domains of functioning, including acquiring and using

---

[4]  The regulations applicable to adult disability claims "require application of a 'special technique'" that requires the ALJ to "rate the degree of functional limitation" across four broad functional areas in cases involving a medically determinable mental impairment.  *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (quoting 20 C.F.R. § 404.1520a).  The four broad functional areas include understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing oneself.  20 C.F.C. § 404.1520a(c)(3).  These regulations are also applicable in childhood disability claims "when Part A of the Listing of Impairments is used."  20 C.F.R. § 404.1520a(a); *see also Miller v. Comm'r of Soc. Sec.*, 409 F. App'x at 387 ("the special technique is confined to the evaluation of the severity of mental impairments for adults (persons age 18 and over) and in persons under age 18 when Part A of the Listing of Impairments is used") (internal quotations omitted).  It appears that the ALJ used Part B of the Listing of Impairments when evaluating M.D.C.'s claim. (Tr. 20 (analyzing Listings 112.04, 112.06, 112.08, 112.11)).

information; attending and completing tasks; and caring for yourself. (Tr. 25 ("[t]he claimant does appear to have some difficulties with concentration, though again this may be as much a function of age as of a possible ADHD disorder"); 26 ("at least some of his difficulties with transition appear to involve his unwillingness to abandon activities he enjoys[;] [t]his is significant, but also not behavior which is necessarily uncommon in a child of the claimant's age"); 30 ("[M.D.C.] does appear to have some difficulties controlling his emotional responses and tolerating frustration[;] . . . this sort of behavior is unfortunate, but not necessarily uncommon in children of his young age")).

Considering the importance of M.D.C.'s reported attention and behavioral deficits, and the extent to which the ALJ's mischaracterization and minimization of them affected his analysis, I cannot conclude that the ALJ's errors were harmless. *See Mitchell v. Comm'r of Soc. Sec.*, 2019 WL 2399533 at *2 (concluding ALJ's mischaracterization was not harmless where it affected the RFC assessment, the weight assigned to medical opinions, and the credibility determination); *Vasquez v. Berryhill*, 2018 WL 824183, *3 (D. Conn. 2018) (remanding for new credibility determination and re-weighing of opinion evidence based on ALJ's "factually inaccurate" reading of the record related to his view that plaintiff only engaged in "conservative treatment"; "[w]hile the ALJ does list other reasons for discounting [p]laintiff's credibility, the opinion indicates that the ALJ strongly considered [p]laintiff's 'conservative' treatment history when determining her RFC[;] [f]or example, he declined to give controlling weight to the opinions of two of [p]laintiff's treating physicians in part because he reasoned that the restrictive limitations they assessed were inconsistent with [p]laintiff's treatment history[;] [s]ince the ALJ's evaluation of the opinion evidence *and* of [p]laintiff's subjective complaints was based on inaccurately reading the record in *two* significant ways, the [c]ourt is unable to find

that substantial evidence supports the RFC"); *George v. Comm'r of Soc. Sec. Admin.*, 2019 WL 608850, *3-4 (W.D.N.Y. 2019) (ALJ "plainly" misstated treatment notes from treating physician regarding observations that were "important – and indeed material – to the ALJ's evaluation of [claimant's] claims" of disability; "[u]nder these circumstances, there is good reason to conclude that the ALJ's determination was indeed affected by this misstatement of the record").

For these reasons, I conclude that the ALJ's mischaracterization and diminishment of the record evidence renders his determination "legally flawed and unsupported by substantial evidence" and that remand is warranted.  *See Seignious v. Colvin*, 2016 WL 96219, *5 (W.D.N.Y. 2016); *see also King v. Colvin*, 2016 WL 1398987 at *4 ("[w]here an ALJ mischaracterizes the evidence or relies on only the portions of the record that support a conclusion of 'not disabled,' a remand is necessary"); *Ellis v. Colvin*, 29 F. Supp. 3d at 302 ("[i]t was plainly improper for the ALJ to bolster his own RFC assessment with a blatant misstatement of the record").

Having concluded that remand is required, I need not address any other specific challenges to or perceived deficiencies in the ALJ's decision.  That said, for the benefit of proceedings on remand, I note that both parties agree that the ALJ, in evaluating the persuasiveness of the opinion rendered by non-examining state consultant Dr. Meyer, erroneously stated that Dr. Meyer ignored the results of the independent speech evaluation when rendering her opinion.  (Docket ## 7-1 at 11; 9-1 at 20).  Accordingly, on remand the ALJ should consider re-evaluating the persuasiveness of Dr. Meyer's opinion, particularly as it pertains to the domain of interacting and relating with others.

## <u>CONCLUSION</u>

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 9)** is **DENIED**, and plaintiff's motion for judgment on the pleadings **(Docket # 7)** is **GRANTED** to the extent that the Commissioner's decision is reversed, and this case is remanded to the Commissioner pursuant to 42 U.S.C. § 405(g), sentence four, for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

*s/Marian W. Payson*

MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      March 15, 2023